**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | **CRIMINAL NO. 8:25-CR-00186-DLB** |
| **v.** | * | |
| | * | |
| **KENDRA N. SCARBOROUGH,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| | * | |
| | * | |

*******

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through undersigned counsel, hereby submits the following memorandum in aid of the sentencing of the defendant, Kendra Scarborough, which is scheduled for September 9, 2026 at 10:00 am.

The defendant attempted to defraud the United States government out of more than $1.1 million by filing three fraudulent tax refund claims on behalf of trusts that she controlled. She knew that her trusts were not entitled to these refunds; she based her claims on bogus tax withholdings on Forms 1099 that she fabricated and filed with the Internal Revenue Service ("IRS") to support her false refund claims. One of the defendant's false tax returns resulted in the IRS mistakenly issuing her a refund in the amount of $412,187, which she used to pay off her mortgage and other creditors.

The tax system in this country relies on individuals to be honest on their tax filings, including when they make claims for income tax refunds. The defendant intentionally violated that trust for her personal benefit. This is a serious offense, and the punishment meted out by the Court must both account for the lack of respect for the law demonstrated by the defendant through her conduct and deter others from taking similar advantage of the tax system for individual gain. For these reasons, the government respectfully requests that the Court sentence the defendant to a term of imprisonment of 21 months.

# I. BACKGROUND

## A. Factual Summary

Prior to 2018, the defendant had a traditional tax filing history. Then she learned about a scheme whereby she could create purported trusts, file tax returns and other documents in the names of those trusts with the IRS, and, if the IRS believed the false information she listed on the returns, obtain large tax refunds that she knew she was not entitled to receive. In April 2018, the defendant put her plan in motion by obtaining tax identification numbers for two trusts: Kendra Nicole Scarborough Trust and Black Hawk Trust. Then, in late 2019 and early 2020, the defendant's scheme hit full speed when she filed three false tax returns for these trusts that collectively sought more than $1.1 million in refunds from the IRS.

| Return | Approximate Date of Filing | False Item | Refund Claimed |
|---|---|---|---|
| 2018 Form 1041 for Kendra Nicole Scarborough | December 24, 2019 | Line 1, Interest Income: $595,636<br><br>Line 25e, Federal Income Tax Withheld: $595,636 | $354,746 |
| 2018 Form 1041 for Kendra Nicole Scarborough Trust | March 2, 2020 | Line 1, Interest Income: $595,636<br><br>Line 25e, Federal Income Tax Withheld: $595,636 | $354,746 |
| 2019 Form 1041 for Black Hawk Trust | March 5, 2020 | Line 1, Interest Income: $692,601<br><br>Schedule G, Line 14, Federal Income Tax Withheld: $692,601 | $412,187 |

The defendant knew that her trusts did not have income. And she certainly knew that they had not paid millions to the IRS in federal tax withholdings to qualify for the refunds claimed on the returns. To maximize her chances of the IRS paying out on her fraudulent refund claims, she took her scheme one step further. The defendant established accounts with Tax1099.com and

1099Online.com, companies through which individuals and entities can file Forms 1099 with the IRS, and filed more than 20 informational returns that appeared to support figures claimed on her trust tax returns.

Unfortunately, one of the defendant's three false tax returns – the 2019 Form 1041 for Black Hawk Trust – tricked the IRS into issuing the trust a U.S. Treasury check in the amount of $412,187. In June 2020, after the defendant received the check, she opened a bank account in the name of Black Hawk Trust. She deposited the check the same week and began spending her fraudulent proceeds. In just the one-month period between June 30 and July 31, 2020, the defendant spent or transferred nearly all the refund proceeds. She used $191,984 to pay off the remaining mortgage balance on her home, paid her utility creditors $10,140.70, and transferred $200,000 into a bank account held in the name of Christian Eagle Rock Ministries, another entity she controlled. By the time the IRS attempted to recoup the refund, only approximately $2,000 was left to be levied from the trust's account.

The defendant knew she was not entitled to the money she received from the IRS. Between the time that the defendant filed the Black Hawk Trust return in March 2020 and received the resulting refund check in June 2020, the IRS began sending the defendant correspondence about the returns she had filed for the Kendra Nicole Scarborough Trust. The defendant responded to the IRS notices with papers espousing tax defier ideology, including several bogus purported financial instruments. In July 2020, after the defendant had spent most of her refund check from the Black Hawk Trust, the IRS began sending her notices about that return as well. The IRS also sent the defendant a letter in June 2021 warning her that the refund claim on the 2018 Forms 1041 had no basis in law, and admonishing that she would be penalized if she failed to withdraw the tax return. Later in 2021, an IRS collections officer was assigned to recoup the fraudulently-obtained refund and other taxes that had been assessed against the defendant's trusts. During a conversation with the

defendant in December 2021, the collections officer repeated what was in the earlier warning letter – the defendant's position about being entitled to tax refunds was false and frivolous. Throughout 2021 and 2022, the collections officer continued to send multiple publications, letters, and notices to the defendant about her frivolous trust filings.

Even after receiving all these notices and warnings from the IRS, the defendant did not withdraw her 2018 returns, and she did not make any attempt to repay the more than $400,000 she had stolen from the government.

### B. Procedural History

On June 25, 2025, a grand jury in this District returned an indictment charging the defendant with three counts of aiding and assisting in the preparation of false tax returns, in violation of 26 U.S.C. § 7206(2) (Counts 1-3), one count of theft of government funds, in violation of 18 U.S.C. § 641 (Count 4), and two counts of money laundering, in violation of 18 U.S.C. § 1957 (Counts 5). On June 2, 2026, the defendant appeared before this Court and pleaded guilty to Count 4 of the indictment.

## II. SENTENCING CONSIDERATIONS

### A. Statutory Maximum Penalties

A violation of 18 U.S.C. § 641 is punishable by up to 10 years in prison, three years of supervised release, a $250,000 fine or twice the gross pecuniary gain from the offense, and a $100 special assessment.

### B. United States Sentencing Guidelines

The Supreme Court has declared that "[a]s a matter of administration and to secure nationwide consistency, the [United States Sentencing] Guidelines should be the starting point and the initial benchmark" for sentencing. Gall v. United States, 552 U.S. 38, 49 (2007).

The government concurs with the PSR's calculation of the Guidelines range. For violations of 18 U.S.C. § 641, the base offense level is determined by the fraud loss that was the object of the offense, including relevant conduct. In this case, the parties stipulated in the plea agreement that the intended loss was $1,121,679, or between $550,000 and $1.5 million, which corresponds to a Base Offense Level 20. See U.S.S.G. §§ 2B1.1(a)(2) and 2B1.1(b)(1)(H). The parties further stipulated that because she timely accepted responsibility for her offense, the defendant is entitled to a two-level reduction in offense level, pursuant to U.S.S.G. § 3E1.1(a), and an additional one-level reduction in offense level, pursuant to U.S.S.G. § 3E1.1(b), upon the government's motion. Finally, based on the PSR's evaluation of her criminal history, the government agrees that the defendant is entitled to an additional two-level reduction in offense level, pursuant to U.S.S.G. § 4C1.1(a)(1), because she is a Zero-Point Offender. After application of these reductions, the resulting offense level is 15, which, for an individual in Criminal History Category I, corresponds to a Guidelines range of 18-24 months.[1]

C. Section 3553(a) Sentencing Factors

Title 18, United States Code, Section 3553(a) sets forth the factors that the Court must consider in imposing sentence. For the reasons set forth below, the government submits that a sentence at the midpoint of the Guidelines range is sufficient, but not greater than necessary, to address each of these sentencing factors.

1. *Nature and Circumstances of the Offense and History and Characteristics of the Defendant*

The first factor that the Court must consider is the nature and circumstances of the offense and the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1).

[1] This calculation would be the same under the new Guidelines amendments that are scheduled to go into effect November 1, 2026.

The defendant successfully stole more than $400,000 from the IRS and tried to take even more before her scheme was detected. She knew she was not entitled to this money. As a person who has worked nearly her entire adult life, she understood what it means to earn income and to have federal income tax withholding. She knew very well that her trusts had no income or withholdings, but she also knew that by reporting that they did, and by submitting additional documents to the IRS that purported to support the figures on the return, she could reap huge financial benefits. With the ill-gotten gains, the defendant paid off her mortgage and other debts. Even when her fraud was detected, and the IRS tried to recoup the refund proceeds, she refused to pay the money back.

This conduct is incredibly serious and overshadows the defendant's otherwise law-abiding life. She must be held accountable – not just by paying restitution, but by serving a term of imprisonment as well.

2. *Need for Sentence to Reflect Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense*

Section 3553(a)(2)(A) provides that sentences must reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

The fact that the defendant ignored IRS efforts to collect her wrongfully obtained tax refund and responded to those efforts by filing more frivolous documents demonstrates that she lacks adequate respect for the law. More broadly, she took advantage of the U.S. tax system, which relies on the honesty of individual taxpayers to accurately report their income and only claim refunds to which they are entitled. Overall, the circumstances of the offense and the defendant's conduct after the civil collection efforts began call out for a sentence that will instill within her a greater respect for the law than she had when she committed her crimes.

3. *Adequate Deterrence to Criminal Conduct*

Section 3553(a)(2)(B) provides that the sentence imposed should "afford adequate deterrence to criminal conduct." This factor codifies the penal goal of general deterrence. United States v. Carter, 463 F.3d 526, 529 (6th Cir. 2006).

General deterrence is a goal of sentencing in all criminal cases, but it plays a heightened role in criminal tax cases because the government relies heavily on deterrence to successfully enforce the internal revenue laws. The reason for this is simple: the number of taxpayers in the United States far exceeds the number of auditors and criminal investigators available at the IRS. The government does not have the resources to detect or pursue every instance of tax misconduct. Therefore, the federal tax system requires the honesty and integrity of taxpayers. See Spies v. United States, 317 U.S. 492, 495 (1943) ("[t]he United States has relied for the collection of its income tax largely upon the taxpayer's own disclosures").

False refund schemes, like the one perpetrated by the defendant, are all too common, but those who successfully trick the IRS through these fraudulent filings have the potential to reap substantial financial rewards. Therefore, sentences in criminal tax cases must send a strong message to would-be tax cheats that the cost of tax noncompliance is not worth the coveted benefits. Courts have routinely recognized this issue. For example, the Fourth Circuit has noted: "The vast majority of [tax] crimes go unpunished, if not undetected. Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path." United States v. Engle, 592 F.3d 495, 502 (4th Cir. 2010). Accord United States v. Ture, 450 F.3d 352, 357 (8th Cir. 2006) (quoting U.S.S.G. Ch. 2, Pt. T, introductory cmt.) ("Because of the limited number of criminal tax prosecutors relative to the estimated incidence of such violations, deterring others from violating tax laws is a primary consideration underlying [the

Guidelines]. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to the would-be violators.").

Therefore, the Court must impose a sentence in this case that will cause others to think twice before filing a false income tax return in the hope of receiving a large refund. The government respectfully submits that a 21-month term of imprisonment is sufficient, but not greater than necessary, to accomplish that goal.

4. *Kinds of Sentences and Sentencing Range Under the Guidelines*

Although the United States Sentencing Guidelines are advisory, § 3553(a)(4) directs the Court to consider "the kinds of sentence and the sentencing range established for (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines." The Supreme Court has recognized that "in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" Kimbrough v. United States, 552 U.S. 85, 89 (2007) (quoting Rita v. United States, 551 U.S. 338, 350 (2007)).

The Sentencing Guidelines reflect the consensus that those convicted of economic crimes should not be able to avoid incarceration. The legislative history of the Sentencing Reform Act of 1984, which created the United States Sentencing Commission, made clear that one of the Act's goals was to rectify a serious problem in the criminal justice system: "some major offenders, particularly white-collar offenders . . . frequently do not receive sentences that reflect the seriousness of their offenses." See U.S.C.C.A.N., 98th Cong., 2nd Sess. (1984) at 3260. As Justice Breyer, previously an original member of the Sentencing Commission, explained, "the Commission decided to require short but certain terms of confinement for many white collar offenders, including tax, insider trading, and antitrust offenders, who previously would have likely received only probation" in order to reduce the sentencing discrepancies between "certain white-collar crimes,

such as fraud, and other similar common law crimes, such as theft." See Breyer, "The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest," 17 Hofstra L. Rev. 1, 20 (1988). This approach provides just punishment for the considerable harm that white collar crimes cause society. See also United States v. Snipes, 611 F.3d 855, 870 (11th Cir. 2010) (recognizing that the Guidelines provisions for tax offenses are the product of "empirical analysis" and reflect the relevant "legislative history supporting higher sentences for white-collar crime").

In this case, the Guideline range of 18-24 months falls within Zone D of the Sentencing Table. When the Guidelines were mandatory, a range in Zone D required a sentence of incarceration. U.S.S.G. § 5C1.1(f). This demonstrates that the Sentencing Commission intended for individuals in the defendant's position to receive sentences of incarceration for their crimes.

*5. Avoiding Unwarranted Sentencing Disparities*

The Court must also consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Below is a summary of cases in which defendants have been sentenced to prison for filing false tax returns like those that this defendant filed:

| Case | Facts | Prison Sentence |
|---|---|---|
| Sandra Curl and Percy Jacobs (D. Md.; 8:19-cr-444) | Defendants filed false returns seeking over $2.2 million | 30 months |
| Luscious Mack (N.D. Ga. 1:19-cr-459) | Defendant filed tax refund claims totaling $860,483 | 49 months |
| Ehrenfriede Kauapirura (E.D.N.Y; 1:22-cr-379) | Defendant filed tax returns claiming approximately $500,000 in refunds | 33 months |
| Rebecca Cyphers (M.D. Fla; 6:22-cr-76) | Defendant received a $240,000 refund for filing a false tax return | 12 months and 1 day |
| Yolanda Dewar (S.D. Fla; 0:24-cr-60051) | Defendant received approximately $500,000 in refunds | 12 months and 1 day |
| Brigida Chock (D. Hawaii; 1:21-cr-69) | Defendant received approximately $230,000 from false refund claim | 27 months |

Viewed against the sentences received in these similar cases, a 21-month term of incarceration is a reasonable sentence here.

D. Restitution and Forfeiture

Based on the stipulation of the parties in the plea agreement, the Court should order the defendant to pay restitution to the IRS in the amount of **$410,117.44**, representing the actual amount of funds she received from the IRS ($412,187.00**)** less $2,069.56 that the IRS recovered through a levy. The defendant's restitution obligation will be reduced by any funds recovered through forfeiture or other enforced IRS collection efforts.

The parties further agree that the Court should enter an Order of Forfeiture for a money judgment in the amount of **$410,117.44**, and further order that the defendant forfeit **$169,886.58** in proceeds from the original $412,187.00 refund that is currently being held by Truist Bank.

## III. CONCLUSION

The defendant stole more than $400,000 from the IRS simply by filing a false tax return. And she tried to take the government for more than $1.1 million in total through her three false trust returns. When she was caught, the defendant refused to acknowledge that she had done anything wrong. She did not withdraw her returns or pay back the money, and she continued to file frivolous documents and advance bogus arguments in support of her claims.

The defendant's fraud was not just against the IRS, but against all honest taxpaying citizens who dutifully report their income and only claim refunds to which they are entitled. Fraudulent refund schemes, such as those perpetrated by the defendant, must be punished with incarceration to deter others from following the same path. The defendant had her chance to pay back the money she took, but that opportunity has passed.

For all of these reasons, the Court should not only order the defendant to pay restitution to the IRS but also impose a term of incarceration that is sufficient, but not greater than necessary, to address her criminal conduct.

Respectfully submitted,

COLIN M. MCDONALD
Assistant Attorney General
Department of Justice
National Fraud Enforcement Division

By: */s/ Melissa S. Siskind*
MELISSA S. SISKIND
Trial Attorney, Tax Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
202-598-7822
Melissa.S.Siskind@usdoj.gov